IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:06-CT-3025-BO

**FILED**

AUG **0 5** 2008

DENNIS P. IAVARONE, CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

CHARLES M. CASSELL, III,               )
                                       )
                Plaintiff,             )
                                       )
        v.                             )         **ORDER**
                                       )
DR. JAGUST, et al.,                    )
                                       )
                Defendants.            )

The plaintiff, a state inmate, filed this action pursuant to 42 U.S.C. § 1983. On April 12, 2006, the undersigned conducted the frivolity review of the original complaint and allowed the matter to proceed against the two named defendants, Dr. Morton Jagust and Dr. Donald Micklos.[1] The frivolity review also denied the motion for a temporary restraining order (TRO). The denial of the TRO was appealed to the Fourth Circuit. The Fourth Circuit dismissed in part, affirmed in part petitioner's challenge of that denial.

After the initial frivolity review, plaintiff began filing multiple confusing and voluminous motions and other paper filings. Therefore, the court entered orders on August 17, 2006, February 15, 2007, and July 30, 2007. Each of these orders warned plaintiff about filing unnecessary and excessive filings which were not helpful to the court and which were impeding judicial efficiency and the administration of justice, as well as, rising to sanctionable behavior if the court's warning were to go unheeded. Further, the August 17, 2006, order allowed plaintiff to amend his original complaint. The court provided a clear directive on the proper way to file an amended complaint. Instead of complying, plaintiff continued to file numerous confused filings.

---

[1]Dr. Donald Micklos was erroneously impleaded as Dr. Mickalas.

Thus, the orders of February 15, 2007, and July 30, 2007, held that the plaintiff violated the directive and order of the court and dismissed numerous filings by plaintiff in violation of Rule 8 of the Federal Rules of Civil Procedure.

Since that time, plaintiff has filed a "Notice of Hearing" and "Extraordinary Motion Multi-Motion in Compliance with the Order for Scheduling and Request for Discovery" [D.E. 73], "Amendment New and Additional Civil Rights Violations and Defendants" [D.E. 74], a letter filed November 2, 2007, with attached exhibits [D.E. 75], "Amendment New and Additional Civil Rights Allegations and Defendants Exhibits in Support to Follow and Evidence is Undisputable" [D.E. 81], "Response to Defendants Motion for Summary Judgement [sic] and Motion to Continue to Jury Trial and Extension of Time for Motions and Depositions" [D.E. 82], a letter filed January 17, 2008 [D.E. 83], letter filed February 4, 2008 [D.E. 84], letter filed April 1, 2008 [D.E. 85], "Extraordinary Motion to Add Additional Traverse and Amendment to Complaint and Moves for Trial or Evidentiary Hearing" [D.E. 86], "response to Defendants Response [D.E. 88], "Extraordinary Motion Concerning Life or Death and/or Serous Bodily Harm Extraordinary Motion for Consideration to Amend" [D.E. 89]. Defendants have filed a motion for summary judgment to which plaintiff has responded multiple times. The matter is ripe for determination.

## Statement of the Claims

Plaintiff alleges that on an unspecified date, he stopped taking prescribed pain medication and stopped the use of his wheelchair for six weeks for religious reasons. He contends that when he requested the return of the prescribed medication and wheelchair, the request was refused. Plaintiff asserts a neurosurgeon recommended the prescribed treatment. He asserts that Dr. Jagust changed and reduced his pain medications. He also asserts that Dr. Micklos reduced his

2

pain medication. He contends that both defendant doctors failed to prescribe medications previously prescribed and failed to prescribe a wheelchair.

## Statement of the Facts

The facts as set out below are based on the affidavits of Dr. Jagust and Dr. Micklos and plaintiff's accompanying medical records. Prior to Dr. Jagust's first examination of plaintiff on November 2, 2005, Kenneth O. Price, M.D. treated him for chronic low back pain. Dr. Price is a neurosurgeon with a practice at Regional Neurosurgery. Dr. Price conducted diagnostic testing. At the time of Dr. Jagust's initial examination of plaintiff, he was taking Vicodin, which is a narcotic pain killer.

On October 18, 2005, plaintiff under went a series of tests resulting in normal results, excepting degenerative changes of the L5-S1 discs and osteoarthritic changes at L4-5 and L5-S1.

On October 28, 2005, plaintiff was seen in the medical clinic after requesting pain medication in a sick call. At that time, he stated he could not sit, stand or lay down because of the back pain. The nurse evaluated plaintiff and referred him to the unit doctor for further evaluation.

On November 1, 2005, Dr. Price saw plaintff for a follow-up visit. Dr. Price recommended plaintiff be given Methadone 10MG three times per day and referred him to the pain clinic for chronic low back pain. Dr. Jagust did not receive and review Dr. Price's consultation note until November 9, 2005.

On November 2, 2005, Dr. Jagust examined plaintiff for the first time. He noted the results of October 18, 2005, tests ruling out a "mechanical cause" for the back pain. He noted that plaintiff had seen Dr. Price on November 1, 2005, and that Dr. Price recommended a referral to the pain clinic. Dr. Jagust's assessment was low back pain. Dr. Jagust was aware that plaintiff

had a history of drug seeking. Dr. Jagust's plan was to submit a request to the Utilization Review Board ("URB") for approval of the referral to the pain clinic for further evaluation. Dr. Jagust noted in the request to the URB that plaintiff had previously been on Methadone and was now taking Vicodin without relief. Dr. Jagust noted Dr. Price had found no surgical indication and recommended the pain clinic. Dr. Jagust instructed plaintiff to continue on Vicodin therapy, 7.5 mg, every four hours. The request to the URB was thereafter denied on November 30, 2005.

On November 3, 2005, Dr. Jagust reviewed plaintiff's medical chart. Dr. Jagust noted that the Vicodin should be taken every six hours, not four hours as previously written. Dr. Jagust discontinued the use of the wheelchair for plaintiff based on his ability to ambulate without one.

On November 4, 2005, plaintiff was seen in the medical clinic after submitting a sick call request on November 1, 2005, seeking medication for lower back pain. The clinic nurse noted plaintiff's anger with the current orders. Plaintiff stated the Vicodin was not working. The clinic nurse counseled plaintiff on taking the Vicodin as ordered not on a sporadic schedule as he reported taking the medication for effectiveness. Plaintiff's chart was placed on the doctor's list for review.

On November 7, 2005, plaintiff was seen in the medical clinic after submitting a sick call request on November 3, 2005. Plaintiff complained of pain and requested the reinstatement of the Methadone and the return of his wheelchair. The nurse noted no apparent acute distress and explained to plaintiff his chart was on the doctor's review list. He was offered analgesic balm which he refused on the basis that it did not work. That same day he submitted another sick call request complaining that his pain medication was insufficient and that he was sleeping three hours a day a half an hour at a time. The request was reviewed on November 9, 2005, the same day he was scheduled to see the doctor.

On November 9, 2005, Dr. Jagust reviewed plaintiff's medical chart. Dr. Jagust reviewed Dr. Price's November 1, 2005, consultation notes. Dr. Jagust noted plaintiff had a long history of drug seeking behavior and determined the current multiple requests to be a result of this behavior. Plaintiff was not complaining of symptoms indicative of a medical change in his condition and Dr. Jagust felt the complaints had been adequately addressed and treated. As a result of his findings, he did not see plaintiff on this date.

On November 14, 2005, plaintiff was seen in the medical clinic after submitting a sick call request on November 10, 2005. He complained of extreme pain in his left knee, hip, and back and that the medication was insufficient. The nurse noted that plaintiff was lying on the floor but was able to get up and go into the examination room on his own. She informed him that a request for pain clinic was pending. She noted that he was moving well and his vitals were good. He was not referred to the unit physician, plaintiff replied "just tell that doctor I'll be talking to my lawyers," and walked out of the examination room.

On November 16, 2005, plaintiff was seen in the medical clinic after submitting a sick call request on November 14, 2005. He complained of extreme back, left knee, left hip, fact and some right hip pain. The nurse noted he was ambulating, sitting, and standing without difficulty and that plaintiff requested stronger pain medication. The nurse reviewed his current prescription and the pending decision for referral to the pain clinic from the URB.[2] Plaintiff voiced his understanding, but asked for more pain medication.

On November 28, 2005, plaintiff was seen in the medical clinic after submitting a sick call request on November 21, 2005. He complained of not being able to sleep due to chronic pain, head and hand tremors, sinus problem and bad drainage in lungs causing increase of

---

[2]This is the URB request discussed on p. 4, the denial of which occurred on November 30, 2005.

Case 5:06-ct-03025-BO   Document 91   Filed 08/05/08   Page 5 of 12

congestion and emphysema. He requested a prostate and pancreas check for cancer. He complained of left knee, hip, and back pain and believed he had suffered a couple of mild heart attacks due to chest pain, stress, and the lack of sleep. The nurse noted that plaintiff rambled as he talked and told her he was going to sue because he was not getting good care. He suggested he talk to mental health about the sleep problems and he became angry. Plaintiff told the nurse he would report her to providing the "wrong" information.

On December 1, 2005, Dr. Jagust reviewed plaintiff's medical chart. At this time, the URB request for a pain clinic referral had been denied on November 30, 2005. The denial indicated the pain clinic therapy would only be considered based on a request for injection therapy. Dr. Jagust renewed the Vicodin prescription. On December 8, 2005, Dr. Jagust submitted a URB request for the injection therapy which was approved on December 17, 2005.

On December 5, 2005, after additional review, Dr. Jagust submitted the URB request referring plaintiff back to Dr. Kenneth Price for neurology consultation for injection therapy with steroids. If plaintiff was experiencing "break through" pain from the use of Vicodin, the injections would control pain without access to narcotic medication and exacerbating plaintiff's drug seeking behavior. On January 6, 2006, Dr. Jagust's URB request was approved.

Between December 6, 2005 and December 28, 2005, plaintiff filed 10 separate sick calls. He complaints consisted of excessive chronic pain in left knee, hip, face and spine, sinus drainage, increased coughing, painful urination, blood in urine, extreme pain of inner rectum, head tremors, an alleged family history of Parkinson's' Disease, prostate problems, lung congestion, shortness of breath when walking and sleep deprivation. On the form dated 12/6/05, plaintiff told the clinic nurse the Vicodin helped him walk. The clinic nurse noted that inmate Cassell was doing very well, his vital signs were stable and he was able to ambulate. On

December 21, 2005, plaintiff complained of shortness of breath when walking. The clinic nurse noted that he was able to ambulate slowly. He was referred to the unit physician. Between December 6, 2005 and December 28, 2005, Dr. Jagust did not conduct any chart reviews or personally exam plaintiff.

On January 4, 2006, plaintiff was seen in the medical clinic by Nurse Smith. The visit was in response to his ongoing sick call requests for excessive pain. On this date, Nurse Smith noted plaintiff ambulated slowly but was able to sit and get out of the chair without a problem. Plaintiff was reminded that he had signed and broken his contract for narcotics by being verbally abusive to the nursing staff. Plaintiff stated, "I'll see you in Federal Court then."

On January 9, 2006, Dr. Jagust reviewed plaintiff's medical chart. This was as a follow-up to the January 6, 2006, neurology consultation with Dr. Price. Dr. Jagust noted disagreement with Dr. Price's recommendations for both Methadone and a wheelchair when walking more than 200 feet. Dr. Jagust's based his decision on plaintiff's repeated demonstration of his ability to walk without wheelchair assistance. Furthermore, plaintiff had failed to comply with the terms of his narcotic contract. Dr. Jagust believed that his request for Methadone was continued drug seeking. Dr. Jagust's plan was to continue plaintiff on his present treatment, Vicodin.

On January 12, 2006, Dr. Jagust again reviewed plaintiff's medical chart. Dr. Jagust renewed inmate Cassell's prescription for Vicodin to be taken four times per day for one month.

On January 18, 2006, Dr. Jagust reviewed plaintiff's medical chart, noting the same complaints of low back pain and an apology for his tirade against the nurse. Also, Dr. Jagust noted a pending URB referral to the pain clinic submitted by Dr. Monica Rae Hill. Dr. Jagust's plan was to prescribe Percocet 5mg to be taken three times a day for two weeks. Dr. Jagust instructed plaintiff to return as needed. The URB request for the pain clinic by Dr. Hill was later

7

denied on February 1, 2006.

On January 26, 2006, Dr. Jagust reviewed plaintiff's medical chart and renewed the order for Percocet 5mg to be taken three times a day for two weeks. Dr. Jagust also issued Duratuss cough syrup for one week. Between January 26, 2006, and February 27, 2006, Dr. Jagust was not involved in plaintiff medical care, nor was plaintiff referred to Dr. Jagust for treatment during this time period.

In February 2006 Dr. Micklos first began working for the NCDOC. On February 4, 2006, plaintiff requested a nurse to refill his folic acid prescription during her medication rounds.

On February 6, 2006, Dr. Micklos conducted a routine review plaintiff's medical chart. Dr. Micklos noted the denial of the URB request in November 2005 for plaintiff to be seen in the pain clinic.

On February 8, 2006, Dr. Micklos conducted a chart review in response to several sick calls requests dated 2/1/06 and 2/6/05, respectively. Plaintiff made various complaints including being in extreme pain, having sleep deprivation, and needing his pain medication dosage increased. Dr. Micklos' plan was to prescribe Vistaril 25mg, a sedative which causes relaxation and relief from anxiety and is used to treat pain, to be taken twice daily for four weeks. The Vistaril was to be taken along with the previously prescribed 5mg of Percocet.

On February 10, 2006, plaintiff was escorted to the medical clinic for a nebulizer treatment. At the time for his appointment, plaintiff was found lying on his left side on the ground. He stated that he slipped off the sidewalk and fell. Plaintiff was assisted into a wheelchair and was examined by the clinic nurse. His feet and arms were cuffed. The clinic nurse examined both of his knees and observed no edema (swelling), bruising, or open areas. The nurse administered the ordered nebulizer treatment until plaintiff became angry and started

8

yelling expletives to her. This resulted in his return to segregation. He walked slowly back towards segregation, taking small steps with his body bent forward. His hands and arms remained cuffed. Eventually, he was transferred to a wheelchair due to limited range of motion from being cuffed.

On February 13, 2006, plaintiff was examined following a sick call request. Plaintiff complained about wanting the proper amount of pain medication, tremors, head wobbles, and that his "right hand finger messed up from hand cuffs, fell messed back up... no medical assistance." Plaintiff sought to have his duratruss reordered and an increased dose of Percocet. Nurse Anderson noted plaintiff's ability to squat in his cell and ability to get up without difficulty. She performed a physical examination. She noted no tremors in his right hand. She referred him to the unit doctor for evaluation at this time.

On February 15, 2006, plaintiff was examined in response to a sick call request. He complained of needing his pain medication refilled and increased. He indicated he was hardly able to walk, had bad sinuses and that his facial plates were loose. The nurse noted his "ability to move and ambulate in segregation cell. Gets up and down well." She noted that he was being treated with medications and that his concerns had been addressed with NCDOC Health Services. Her assessment was alleged alteration of comfort.

On February 20, 2006, Dr. Micklos examined plaintiff following his referral from a sick call appointment. Plaintiff complained of lower back pain. Dr. Micklos conducted a physical exam of plaintiff and noted that plaintiff's lumbar sacrum was tender with radiculated spasms. Plaintiff did not mention any complaints about his right hand and/or finger, therefore, Dr. Micklos did not assess or treat his hand or finger. Furthermore, plaintiff did not request the use of a wheelchair or exhibit any symptoms which indicated he was unable to walk. Dr. Micklos'

9

assessment was lumbo-sacral strain and DJD (degenerative joint disease). Dr. Micklos' plan was
to prescribe Flexeril 10mg (treats muscle spasms) to be taken every eight hours for two weeks.
Dr. Micklos also prescribed an egg crate mattress for one year and renewed his Percocet
prescription for another month. Dr. Micklos continued to treat plaintiff after February 27, 2006.

## Discussion

Summary judgment is appropriate when, after reviewing the record taken as a whole, no
genuine issue of material fact exists and the moving party is entitled to judgment as a matter of
law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary
judgment bears the initial burden of demonstrating the absence of a genuine issue of material
fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its
burden, the non-moving party may not rest on the allegations or denials in its pleading, but "must
come forward with specific facts showing that there is a genuine issue for trial." Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation omitted & emphasis
removed). A trial court reviewing a summary judgment motion should determine whether a
genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. The court construes
the evidence in the light most favorable to the non-moving party and draws all reasonable
inferences in the non-movant's favor. See Matsushita, 475 U.S. at 587.

Defendants assert the defense of qualified immunity. Government officials are entitled to
qualified immunity from civil damages so long as their conduct "does not violate clearly
established statutory or constitutional rights of which a reasonable person would have known."
Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Saucier v. Katz, 533 U.S. 194, 202 (2001).
Qualified immunity protects government officials "where the law is unsettled or murky." See
Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001). The test is whether the act was clearly

10

forbidden, not whether in hindsight the action was wrongful. See id. The first step in evaluating qualified immunity is to determine whether the plaintiff has alleged the deprivation of a constitutional right. Id.

Deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 105-106 (1976). In order to be liable, the official must have actual knowledge or awareness of the need. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). The indifference must be objectively harmful enough to establish a constitutional violation. See id. at 837–40. The court can rely on the medical affidavits and prison medical records in ruling on a motion for summary judgment. See generally, Stanley v. Hejirika, 134 F.3d 629, 637-38 (4th Cir. 1998); Marshall v. Odom, 156 F. Supp. 2d 525, 530 (D. Md. 2001); Bennett v. Reed, 534 F. Supp. 83, 86 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir. 1982).

Delay in medical care, with no resulting injury, does not violate the Eighth Amendment. See Strickler v. Waters, 989 F.2d 1375, 1380–81 (4th Cir. 1993); Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993). A prisoner is not entitled to choose his course of treatment. See Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam). Likewise, mere negligence in diagnosis or treatment does not state a constitutional claim. Estelle, 429 U.S. at 105–06.

Dr. Jagust and Dr. Micklos are entitled to qualified immunity. From the proffered facts and medical records it is evident that plaintiff was continually seen and cared for. The doctors evaluated plaintiff, prescribed treatment, and referred him for further evaluations. Because of his history of drug seeking it was incumbent on the doctors to fully evaluate and consider different treatment courses. There is no indiction within the medical records that the treatment and care of

11

plaintiff by Dr. Jagust or Dr. Micklos was anything but reasonable and they are each entitled to qualified immunity.

Accordingly, the motion for summary judgment is allowed and the matter is dismissed. Having so determined, all pending motions are likewise denied.

SO ORDERED. This the 5 day of July 2008.

TERRENCE W. BOYLE
United States District Judge